RECEIVED

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

MAR 0 6 2012 *alw*

THOMAS G BRUTON
CLERK, U.S DISTRICT COURT

United States of America ex rel.                )
                                                )
JIMMY A. BOYD,                                  )
(Full name and prison number)                   )
(Include name under which convicted)            )
                                                )
PETITIONER                                      )
                                                )
        vs.                                     )
                                                )
MARCUS HARDY,                                   )
(Warden, Superintendent, or authorized          )
person having custody of petitioner)            )
                                                )
RESPONDENT, and                                 )
                                                )
(Fill in the following blank **only** if judgment )
attacked imposes a sentence to commence         )
in the future)                                  )
                                                )
ATTORNEY GENERAL OF THE STATE OF·               )
                                                )
                                                )
(State where judgment entered)                  )

12 C 1638
Judge Joan H. Lefkow
Magistrate Judge Young B. Kim

Case Number of State Court Conviction:

03-CF-890

### PETITION FOR WRIT OF HABEAS CORPUS – PERSON IN STATE CUSTODY.

1. Name and location of court where conviction entered: Circuit Court of DuPage County For

The 18th Judicial Circuit of Illinois. P.O. Box 707, Wheaton, Illinois 60189.

2. Date of judgment of conviction: October 2, 2003

3. Offense(s) of which petitioner was convicted (list all counts with indictment numbers, if known)

Aggravated Battery, Aggravated Battery with a Firearm, 2 counts of Armed Robbery
4 counts of Home Invasion.
4. Sentence(s) imposed: a concurrent terms of 55 and 45 years

5. What was your plea? (Check one)      (A) Not guilty       ( x )
                                   · (B) Guilty              (   )
                                        (C) Nolo contendere  (   )

If you pleaded guilty to one count or indictment and not guilty to another count or indictment, give details:

## PART I -- TRIAL AND DIRECT REVIEW

1. Kind of trial: (Check one):    Jury ( x )       Judge only ( )

2. Did you testify at trial?    YES ( )     NO   ( x )

3. Did you appeal from the conviction or the sentence imposed? YES ( x )  NO ( )

    (A) If you appealed, give the

        (1) Name of court:  Appellate Court of Illinois Second District.

        (2) Result:  reversed and remanded to sentencing

        (3) Date of ruling:  March 16, 2006

        (4) Issues raised:  Violation of speedy-trial rights; ineffective assistance of counsel; State failed to prove guilt beyond a reasonable doubt; the court incorrectly instructed the jury regarding eyewitness identification testimony; violation of one-act-one crime; disproportionate sentence

    (B) If you did not appeal, explain briefly why not:

4. Did you appeal, or seek leave to appeal, to the highest state court? YES ( x )    NO ( )

    (A) If yes, give the

        (1) Result  leave to appeal denied

        (2) Date of ruling:  September 27, 2006

        (3) Issues raised: The evidence against Mr. Boyd was so weak, improbable and unsatisfactory so as to raise a reasonable doubt as to his guilt; trial court submitted an erroneous instruction to the jury that misinformed them as to the elements that they were required to evaluate in determining the reliability eyewitness identification testimony; unconstitutional disproportionate penalty

    (B) If no, why not:

5. Did you petition the United States Supreme Court for a writ of *certiorari*? Yes ( )  No ( x )

    If yes, give (A) date of petition: _____ (B) date *certiorari* was denied: _____

2

## PART II -- COLLATERAL PROCEEDINGS

1. With respect to this conviction or sentence, have you filed a post-conviction petition in state court?

YES (×)   NO ( )

   With respect to *each* post-conviction petition give the following information (use additional sheets if necessary):

   A.   Name of court:   Circuit Court of DuPage County

   B.   Date of filing:   March 25, 2010

   C.   Issues raised:   Ineffective assistance of counsel at trial and on appeal


   D.   Did you receive an evidentiary hearing on your petition?   YES ( .)   NO (x)

   E.   What was the court's ruling?  summarily dismissed

   F.   Date of court's ruling:   June 16, 2010

   G.   Did you appeal from the ruling on your petition?   YES (x)   NO ( )

   H.   (a)  If yes,   (1) what was the result?   affirmed

              (2) date of decision:   June 10, 2011

        (b)  If no, explain briefly why not:

   I.   Did you appeal, or seek leave to appeal this decision to the highest state court?

        YES ( x)  NO ( )

        (a)  If yes,   (1) what was the result?   leave to appeal denied

              (2) date of decision:   September 28, 2011

        (b)  If no, explain briefly why not:

# STATEMENT OF FACTS

Following a jury trial, the defendant Mr. Jimmy Boyd was found guilty of aggravated battery with a firearm as to Ernesto Quiles and guilty of aggravated battery as to Martha Zinda. (R C831) Mr. Boyd was also found guilty of home invasion as to Quiles and guilty of home invasion as to Zinda. (R C831,832) The jury returned a verdict of not guilty of armed robbery as to Quiles and a verdict of not guilty of armed robbery as to Zinda. (R C831)

The trial judge merged counts 5 and 7 pertaining to the home invasion charge as to Martha Zinda and sentenced Mr. Boyd to 25 years plus a 15-year enhancement for committing home invasion while possessing a firearm for a total sum of 40 years in prison. (R C130) The trial judge also merged counts 6 and 8 pertaining to the home invasion charges as to Ernesto Quiles and sentenced Mr. Boyd to 55 years in prison, 30 years plus a statutory enhancement of 25 years for discharging a firearm causing great bodily harm. (R C131) The sentence of 40 years as to the home invasion count regarding Zinda was to be served concurrently with the 55-year sentence on the home invasion count as to Quiles. (R C131)

Ernesto Quiles, age 23, testified that on January 12, 2003, he had been residing for about a year in apartment #1 at 25 Maple in Addison Illinois with his girlfriend Marcy Zinda and his 6-year old daughter Giselle Quiles. (R C449) Prior to January 12, 2003, Quiles knew an individual whose nickname was "Bird" and who he identified in the courtroom as the defendant Jimmy Boyd. (R C450) One of Quiles' friends, Tony Ogle, was a roommate of Bird. (R 451) Prior to January 12, 2003, Quiles socialized with Bird and Tony. (R C451) Bird had entered Quiles apartment on January 9, 2003 to help move a couch and giant wide-screen television into Quiles' apartment. (R C451) Tony Ogle,

4

People v. Rodriguez, 169 Ill. 2d 183, 661 N.E. 2d 305(1996)    53
People v. King, 66 Ill. 2d 551, 363 N.E. 2d 838(1977)    53
People v. Carter, 344 Ill. App. 3d 663, 801 N.E. 2d 1163(2003)    53
People v. Hicks, 181 Ill. 2d 541, 545, 693 N.E. 2d 373(1998)    53
People v. Dryden, 349 Ill. App. 3d 115, 811 N.E. 2d 302(2nd Dist. 2004)    53,54,55
People v. Cole, 172 Ill. 2d 85, 665 N.E. 2d 1275(1996)    54,55

## V. THE 15-YEAR SENTENCING ENHANCEMENT FOR HOME INVASION BASED ON POSSESSION OF A FIREARM IS UNCONSTITUTIONALLY DISPROPORTIONATE TO THE PENALTY FOR AGGRAVATED BATTERY WITH A FIREARM.

People v. Lombardi, 184 Ill. 2d 462, 705 N.E. 2d 91(1998)    56,57
People v. Dryden, 349 Ill. App. 3d 115, 811 N.E. 2d 302(2nd Dist. 2004)    56,57

## NATURE OF THE CASE

The defendant Mr. Jimmy Boyd was convicted of home invasion, aggravated battery with a firearm and aggravated battery and was sentenced to terms of 55 years and 40 years for two counts of home invasion, the terms to be served concurrently. Mr. Boyd raises several issues, including the State's failure to prove guilt beyond a reasonable doubt, trial counsel's ineffectiveness in having failed to move for dismissal of the home invasion charges under the Speedy Trial Act, the trial court's giving of an erroneous instruction to the jury as to evaluating the reliability of eyewitness testimony, one of the home invasion convictions should be vacated under the one act one crime rule and the 40-year sentence as to one count of home invasion violates the proportionate penalties clause. No issues are raised on the sufficiency of the indictment.

## JURISDICTION

This is an appeal from judgment following a guilty verdict at a jury trial. Mr. Boyd was sentenced on December 5, 2003. Mr. Boyd's timely notice of appeal was filed on December 9, 2003. This court has jurisdiction pursuant to Supreme Court Rules 604 and 606.

Bird, Quiles and another person whose name was Dave also helped. (R C452) Quiles and Bird were friends but Quiles was not as close to Mr. Boyd as he was to Tony. (R C452) Dave had loaned $500.00 to Quiles to buy the T.V. (R C453) After the T.V. had been moved into the apartment, Quiles went into the bedroom to get $500.00 from his safe to give it to Dave. (R C453) Bird accompanied them. (R C453) In the bedroom, Quiles showed Bird his aquarium, which had exotic frogs. (R C453)

The next time Quiles saw Bird again was 7:00 A.M. on January 12, 2003 in his apartment. (R C454) Quiles was sleeping in his bedroom when he was awoken by a loud crash. (R C455) Quiles awoke and walked towards the living room where he saw Zinda walking towards him with Bird pointing a gun behind her neck. (R C455) Bird was wearing dark pants and a pullover jacket and a hoodie that covered his eyebrows. (R C457) Quiles identified Bird in court. (R C455)

Bird told Quiles to get on the floor and Quiles complied. (R C457) Zinda was next to him kneeling. (R C457) Bird asked Quiles to tell him the location of the safe. (R C457) Quiles responded that he did not have a safe. (R C457) Bird was hitting Zinda in the back of the head with the end of the gun asking her, "Where's the money," and then the same thing happened to Quiles. (R C458) Bird restrained Zinda by holding his knee to her back. (R C458) Quiles was also restrained because he was next to Zinda. (R C458)

Quiles alleged that Bird again demanded to know where the safe was and kept hitting Zinda and Quiles on the head with his gun. (R C458) Meanwhile, the other man was looking through the closets in the bedroom. (R C459) Quiles heard the words "I can't find anything." (R C459) The man asked Bird to turn on the light in the bedroom and said "where's the light" and Bird responded "on the dresser." (R C460) The light did not go on. (R C460) The man said "there's nothing here" and "let's go." (R C460) Quiles alleged that Bird got frustrated. (R C460)

As to Zinda, Quiles claimed that Bird pistol whipped her. (R C460) Bird said to Quiles that if they did not tell him where the safe was, he would rape Zinda in front of him. (R C460) Quiles grabbed Bird's arm that was holding the gun and he looked at Bird's eyes. (R C461) Quiles became frightened and let go. (R C461) Quiles was about eight inches away from Bird when he looked at his eyes and got a very good look at his face. (R C461) Bird swung and hit him in the head with the gun. (R 461) Quiles heard Bird get up and the male Hispanic walk out of the bedroom. (R C461)

Quiles then heard a gunshot and felt something go through his leg. (R C461) Quiles heard a second gunshot and felt his stomach burning. (R C462) Quiles could not move. He was in a kneeling position and could not walk. (R C462) At that point, Bird and the male Hispanic left out the window. (R C462) Quiles did not see them again. (R C462) Prior to January 12, 2003 Quiles heard Bird's voice a lot. (R C463) When Bird was at Quiles' apartment, Quiles heard and recognized Bird's voice, which sounded the same as when Quiles had previously met him. (R C463)

Zinda got Quiles some water after Bird and the male Hispanic left. A police officer came and Quiles was transported to Elmhurst Memorial Hospital. (R C464) Quiles was panicking and shaking and the hospital personnel put a mouthpiece over him. (R C464) Quiles woke up in intensive care. (R C464) Quiles had a bullet stuck in his thigh. (R C464) The other bullet entered Quiles right buttock and exited out his stomach around the pelvic area about an inch below his groin. (R C464,465) In the hospital, Quiles was administered drugs and painkilling shots. (R C467) Quiles was in the hospital seven days and in the intensive care unit three of those days. (R C468, 470)

Tony Ogle, Bird's roommate and friend visited Quiles in the hospital. (R C471) Quiles was scared because he thought Tony was involved. (R C471) Quiles feared that he and his family could be hurt again. (R C471) Zinda and Quiles' daughter had not yet moved from their apartment when Tony came to the hospital. (R C472)

The day after Quiles' surgery, January 13, 2003, the police showed Quiles a photo lineup. (R C472) Bird was in the photo lineup and Quiles told the officer that one of Tony's friends might be involved. (R C473) Quiles alleged that he was 100% sure that one of the offenders was Bird but did not tell that to the officer. (R C473) Quiles admitted at trial that he did not tell the officer the truth. (R C473) Quiles claimed that the reason he did not tell the truth was that he was still worried about his family and his daughter and he wanted to get out of the hospital and then tell "some things." (R C473)

Quiles with the help of another police officer made a composite sketch of Bird at the hospital. (R C473) Quiles wanted the officer to make Mr. Boyd's hair lighter but the officer was not able to make the hair light enough for Quiles. (R C474) Quiles claimed that other than the hair it was a good sketch of what the Bird looked like. (R C475)

Quiles was released from Elmhurst Hospital on January 17, 2003. (R C475) Quiles placed a phone call on that date to the police and was up front with the officer about who had shot him. (R C476) Quiles claimed that he felt safer because he was out of the hospital and his family had moved and changed phone numbers. (R C476)

Quiles recalled that he knew the shooter was Bird because when he looked at Bird's face when he was eight inches away after he grabbed the handgun, he looked at him and noticed his eyes. (R C476) Quiles noted that Bird's eyes were different from other people and that he is the only person that Quiles knew that had sunken in eyes. (R C477) Quiles knew that Bird was arrested in late March 2003.

Quiles in the presence of Bird and Tony talked about dealing cocaine. (R C477) In April 2003 Quiles was contacted by a different police agency other than the Addison police department with regard to a drug transaction. (R C477) Quiles was involved in a drug transaction after which DuPage County officers got a hold of him. (R C477) The officer told Quiles that he had him on tape dealing cocaine. (R C478) Quiles became an informant based on what the officer told him. (R C478) Quiles introduced police officers

to drug dealers and he honored his agreement to be an informant. (R C478) The agreement was not related to this case. (R C478)

The first time that Quiles was told the police had him on tape on a drug deal was after Quiles made his statement to police and after Mr. Boyd was arrested. (R C478) Quiles stated he realized he did not have to talk about the fact that he cooperated with police and that he was involved in drug dealing. (R C479) Quiles claimed that there were no threats or promises were made with regard to the present case. (R C479) Quiles denied having previously been convicted of a felony. (R C480)

On cross-examination, Quiles admitted that he had been dealing hard drugs such as cocaine for about one year prior to the incident in this case but denied that he was still dealing drugs. (R C481) Qulies denied that he used cocaine at anytime or on the day of the incident. (R C481) Quiles admitted that he had kept a safe in his apartment having approximately $10,000.00 in cash. (R C483) Quiles claimed that most of the money in the safe belonged to Zinda. (R C485) In addition to the money in the safe, Quiles kept additional money in the house. (R C483) The police found $2,500.00 in one of Zinda's shoes and $700.00 found in a drawer. (R C484) The police also recovered a scale for weighing drugs. (R C484) Quiles was aware that the police searched the house after the incident. (R C483) Quiles claimed he did not remember how much money he received for selling cocaine even though he had been in the business for about one year. (R C485) Quiles claimed that he sold about an ounce of cocaine a week, which was worth about $1,000.00. (R C486) Quiles denied that he dealt drugs in his house. (R C485)

On January 12, 2003 at 2:30 P.M., the day of the incident, Detective Goss spoke to Quiles. (R C487) Though Quiles was on medication, he understood Goss' questions. (R C488) Goss wanted to know who might have had a motive for the crime. (R C488) Quiles told Goss that Tony or a person named Junior or people Tony was involved with

had something to do with the crime. (R C489) Quiles told Goss he considered Tony to be a friend and that he believed he was not involved. (R C490) Quiles thought it was possible Tony was involved, however, but he wanted to talk to Tony himself. (R C490) Quiles told Goss that Bird was an okay friend and that they had hung out with each other for about a year along with other friends. (R C491) Since Quiles knew Bird for a year, he certainly knew his face. (R C492) Quiles would not need to hear Bird's voice to identify him. (R C492) Quiles considered Bird to be a good enough friend that about a week before the incident, he helped Quiles move a large screen T.V. into his apartment. (R C492)

Quiles claimed to have many opportunities to see the offender close up and look into his eyes. (R C493, 498) Yet, before going to the hospital, Quiles did not tell Zinda to tell the police Bird did it but rather told her to tell the police that Tony's boys did it. (R C496) Neither did Quiles tell the police that Bird did it before he went to the hospital. (R C497) Quiles did not ask Bird why he was harming him and Zinda during the break-in. (R C499)

As to the facts concerning the break-in to his home, Quiles told Goss the reason Quiles told the offenders that he did not have a safe was that his combination lock broke and he had a loaded gun in it. (R C502) Quiles was worried that if they opened the safe, they would find a gun and shoot him. (R C503)

Quiles rode in an ambulance with a police officer but did not tell the officer that Bird shot him. (R C504) Quiles told Goss that Bird was a friend of Tony and that he helped move the T.V. in his apartment a week earlier. (R C506) Quiles could have told Goss that Bird was the shooter but he did not. (R C506) Quiles was in a private room in the hospital and did not fear for his safety when he spoke with Goss. (R C507) Quiles did not tell Goss he was suppressing his memory about the incident and the identity of the man who had shot him. (R C507) Quiles never asked the police for protection

9

despite fearing for his safety and that of his family. (R C510) The nurses in his hospital
room were strict about who could enter. (R C511) Zinda spent most of the time with
Quiles in the hospital room until Quiles was discharged from the hospital. (R C512)

Quiles knew Mr. Boyd for about a year and Tony for two years. (R C517) Quiles
would go to Tony's house about once a week. (R C517) Quiles would see as many as
fifteen of Tony's friends when he went over to Tony's house to party. (R C518) When
Quiles had told Zinda to tell police that Tony's boys did it this meant the boys who hung
out at Tony's place. (R C518)

Goss and another detective came to the hospital to interview Quiles again on
January 14, 2003. (R C518) Quiles felt safe enough to tell the officers that the offender
looked like Bird but the offender kept telling him not to look at him and he was laying
face down. (R C519) Goss brought Quiles a group of six photographs showing six
people in a lineup. (R C522) Quiles looked at those pictures in the hospital and saw
Bird's picture. (R C522) Quiles told the police that he recognized Bird's picture and
identified him as the person who moved the T.V. and the couch a week earlier. (R C523)
Quiles also told the police that he thought the offender looked like Bird but he was not
100% sure. (R C524) Quiles claimed he did not say he was 100% sure it was Bird
because he was still in fear. (R C524) Quiles, however, was not so scared that he was
too afraid to say that Bird could have been the offender. (R C525)

Shortly after Quiles left the hospital on January 17, 2003, Goss interviewed him
again. (R C520) Quiles told Goss that Bird was the offender because he has distinctive
eyes and voice. (R C521) Quiles said he did not need to see Bird's eyes or to hear his
voice to recognize him. (R C521) When Quiles finally told Goss that Bird shot him, Goss
questioned Quiles why he did not tell him sooner. (R C507)

On redirect examination, Quiles said he socialized with the Simon City Royals
about once a week for about three years but did not do so anymore and denied being a

member. (R C534) Quiles hung out most frequently with Tony Ogle. (R C534) Quiles saw a tattoo on Tony Ogle indicating membership in the gang. (R C535) Quiles learned about the Simon City Royals and became familiar with gang symbols and tattoos. (R C535)

Bird told Quiles he was a member of the Simon City Royals and had the initials SCR standing for Simon City Royals tattooed on his chest. (R C538) Quiles saw Bird's tattoo when they went swimming in Tony's pool in the summertime. (R C538) Quiles denied being a member of the gang. (R C538) Quiles stated that he became aware that the Simon City Royals are part of a larger nation or group called the Folks. (R C539) At the very end of the attack on Quiles and Martha, Quiles heard the offenders chant "Let's go Folks." (R C540) Quiles thought that that meant the Simon City Royals because that's the only people he knew in the Folks. (R C540) Quiles felt intimidated and reluctant to identify Bird because Bird was a member of that organization. (R C540)

Quiles had been extensively questioned about a statement he made to Zinda "tell them it's Tony's boys." (R C541) The entire statement was it was Tony's boys, the Royals did it." (R C541) The fact that it was one of Tony's boys the Royals, made it difficult to identify Bird. (R C541) Tony showed up to the hospital the night after the attack and that made him scared of the Royals coming to get him because Tony was a Royal. (R C541) However, once Quiles was out of the hospital he told the police he was 100% sure that it was Bird. (R C542)

On re-cross examination, Quiles admitted being a member of the Latin Kings gang since age fifteen but denied that he was still a member of that gang. (R C543) Quiles told Goss that he had been having problem with a person named Junior who was a member of the Milwaukee Kings. (R C544) Quiles claimed he told Zinda to tell the police the Royals did it because he saw Bird. (R C545) Quiles recalled talking to Goss at the hospital on January 12, telling him that what he meant by telling Zinda that the

11

Royals did it was that the two individuals in the house kept on saying the word "Folks" and that the Royals were one of many gangs associated with the Folks. (R C546)

Martha Zinda, age 24, was called to testify. (R C547) On January 12, 2003 Zinda lived in a garden apartment at 25 Maple Avenue Apartment No. 1 in Addison Illinois with her boyfriend Ernesto Quiles and her daughter Giselle Quiles. (R C548) Zinda got off at work at 1:00 A.M. and went out to a bar with a few friends from work where they listened to music and had some drinks. (R C550) Zinda had about four Vodka and cranberry drinks. (R C550) Zinda and her friends then went to a restaurant for breakfast. (R C550) Zinda arrived home just prior to 7:00 A.M. (R C551)

Prior to January 12, 2003, Zinda had met Bird one time. (R C552) A couple days prior to January 12, 2003, Bird went to the furniture store with Zinda and Quiles and helped them move a couch into their apartment. (R C552, 553) Zinda did not have an in depth conversation with Bird but she was present when he talked to other people. (R C553) Zinda then proceeded to make an in-court identification of Mr. Boyd. (R C553)

When Zinda came home slightly before 7:00 A.M. on January 12, 2003, she put her belongings down and went to her computer to shut it down because it had been downloading something from the previous day. (R C554) As Zinda was working on her computer, she heard a loud crash. (R C554) Zinda turned to her right to look at the television because she thought the television had tipped over. (R C554) Instead, Zinda claimed to have seen Bird crouching down and breaking out the window glass with his forearm. (R C554) Bird was wearing a dark blue sport jacket with a dark colored hood that was up. (R C555) Zinda claimed she knew it was Bird because she was focused straight on his face when he jumped through the window. (R C557)

Zinda was standing in front of her refrigerator screaming when Bird jumped through the window. (R C556) Bird came at Zinda with a gun and grabbed the back of her neck by her hair and dragged Zinda into the hallway toward the bedroom. (R C556)

12

Zinda described the gun as dark colored and flat. (R C557) As Bird dragged Zinda into the hallway, Bird asked Zinda where her boyfriend was. (R C558) Zinda saw Quiles standing in front of her and said "Ernesto is right there." (R C558)  Bird pushed Zinda on the ground and told Zinda and Quiles to get on the ground. (R C558) Bird told Quiles to roll over and not to look at him. (R C559) Quiles rolled over, facing down. (R C559) Bird pushed Zinda down and kneeled down on her holding the back of her neck. (R C559) Bird asked Zinda "where's the money" and "where's the safe." (R C559) Each time, Bird hit Zinda in the head with the gun. (R C560)

Zinda claimed that she noticed Bird with a second individual. (R C560) Zinda testified that she did not get a good look at the second individual's face, when Bird and the other individual were breaking into the house, because he was standing straight outside the window and if an individual is standing straight, she could only see their bottom half. (R C560) Subsequently, Zinda heard the second individual in the bedroom. (R C560) Zinda could hear the second individual going through things in the bedroom knocking them down and opening the dresser and looking for something. (R C560) This happened while Bird was on Zinda's back. (R C560) Bird repeatedly asked for the money and the safe and hit Quiles and Zinda on the back of the head.  (R C561) Bird told Quiles that if he did not tell him where the safe was he would rape Zinda. (R C561) The individual in the bedroom kept repeating that he could not find the safe. (R C561) Bird hit Quiles and Zinda with the gun and told Quiles not to look at him. (R C561)

Bird told the individual in the bedroom to turn on the light but the individual responded that he could not find it. (R C562) The individual in the bedroom became frustrated and came out toward the outside. (R C563) The individual said just shoot them. (R C565) Bird let go of Zinda and stood up. (R C565) Zinda heard two gunshots go off. (R C565) Zinda stayed frozen a second not knowing if she was shot. (R C565) After a couple of seconds, Zinda got up. (R C565) Bird and the other individual left the house.

(R C566) Zinda asked Quiles if he was okay and he told Zinda that he had been shot and that she should call 911. (R C566)

The police and the ambulance arrived. (R C566) The police cut off Quiles' clothes and put him on a stretcher and took him to Elmhurst Memorial Hospital. (R C567) About three minutes after the ambulance took Quiles to the hospital, Zinda was put into another ambulance and taken to the hospital. (R C567) Zinda was in the emergency room a couple of hours and had four or five stitches put in her head. (R C567) Zinda could not go back to the apartment because the police closed it off to do their investigation and take pictures. (R C576) Zinda and Quiles' Play Station Two was missing when Zinda returned to the apartment. (R C576) Zinda claimed that the police did not take it. (R C577) The play station was lying on the floor next to the television before it was taken. (R C577)

Zinda alleged that she was 100% sure that Bird was the person that pistol whipped her because she saw him. (R C578) Zinda made statements to the police officers while Quiles was in the hospital but did not them that Bird was the offender. (R C579) Zinda did not tell the police initially that Bird was the offender because she wanted to talk to Quiles when he was okay. (R C578) Then, Zinda went to Quiles and told him "That was your friend that broke in." (R C578) Zinda asked "Why would he do that?" How did he know they had a safe and the light on the dresser? Quiles responded that he knew it was him too. (R C579) Zinda said I have to tell the police something because they are asking me questions. (R C579) Quiles said to Zinda to tell the police it was him but not to say that she was 100% positive until Quiles was out of the hospital because Quiles did not feel safe in the hospital. (R C579) Later, Zinda told the police who did it. (R C579)

On cross-examination, Zinda acknowledged that there was a safe in the house in the bedroom closet. (R C580) Zinda did not know the combination to the safe. (R C580)

Zinda knew that there was about $10,000.00 in the safe. (R C581) Zinda gave money to Quiles and he put it in the safe. (R C581) Quiles also put his own money in the safe. (R C581) There was also $2,500.00 recovered in a shoe and $700.00 in a drawer. (R C581) Zinda claims that she and Quiles were saving the money for a house. (R C582) Zinda did not want to put the money in a bank. (R C582) Zinda claimed that she did not want the interest that would be earned from having a bank account. (R C583) Zinda did not discuss with Quiles putting the money in a bank account. (R C583) Zinda denied that the money was used as operating expenses for a business. (R C582)

Shortly after Quiles told Zinda to call the police and before the police arrived, Quiles told Zinda to tell the police that "Tony's boys the Royals did it." (R C586-587) Zinda did not question Quiles about why they should not say to police that Bird was one of the offenders. (R C590) Zinda explained that she was not concerned with telling the police about Bird but was more concerned with calling the police so they would come. (R C590) Zinda claimed that she was not thinking about Bird whom they recognized as a friend who had moved the T.V a week earlier and traumatized her and shot her boyfriend. (R C590) Zinda claimed that she was in fear of naming the offenders even though the offenders left and the police were on their way. (R C591) The police officer asked Zinda for a description of the offender including weight, height, age, hair color. (R C596) Zinda did not give the police a description other than that the offenders were male white or male Hispanic. (R C596)

The police and ambulance arrived at Zinda's apartment and Quiles was taken to the hospital. (R C592) Before taking Zinda to the hospital, the police asked her to identify the offender. (R C592) Zinda replied that she was unable to do so because she was facing down after one of the offenders pushed her down. (R C592,593) While Zinda was in the emergency room at the hospital, an officer named Sinkkule asked her to describe and identify the offender. (R C593) Zinda did not identify Bird or tell him anything. (R

C594) Zinda told the police that she would not be able to re-identify the offender. (R C595) Zinda claimed she was scared about possible repercussions after she left the hospital if she named the offender. (R C594)

Zinda, however, was not too scared to give a description of the offenders as male white or male Hispanic, early 20's, one wearing a blue sports jacket. (R C596, 597) Zinda did not tell the officer that the name of the guy is Bird and that he moved a T.V. in the apartment a week earlier. (R C597) Zinda had not spoken with Quiles since he left the apartment in the ambulance. (R C597)

Approximately one half hour after talking to Officer Sinkule at the hospital, Zinda spoke to Detective Goss at the hospital at 8:30 A.M. (R C598) Zinda told Goss that Tony's boys the Royals did it. (R C599) Zinda did not tell Goss that the offender was Bird and that he had moved a T.V. into her apartment a week earlier. (R C599) Zinda said she was too shaken to tell Goss. She was more concerned with Quiles who was in surgery. (R C599) Zinda was scared of Bird even though she was in the hospital with police officers present. (R C600)

Zinda left the hospital and stayed at the police station most of the day. (R C602) Zinda did not tell the police at the station who the offender was because she wanted to talk to Quiles at that time. (R C602) Zinda was frightened that she would eventually have to go back to her home. (R C603)

Zinda went back to her apartment at 4:30 P.M. to get her belongings out of the apartment. (R C600) Zinda did not tell the police at this time that Bird was the offender because Quiles told her not to say 100% positively that Bird was the offender until Quiles was out of the hospital. (R C601) Zinda was not able to get into the house at this point because the police had not completed their investigation. (R C602) Zinda's daughter was staying with Quiles' mother while Quiles was in the hospital. (R C600) Zinda was staying at both Quiles' mother's house and at the hospital with Quiles. (R C601)

On January 14, 2004 at 6:30 P.M., two days after the incident, Goss interviewed Zinda in the presence of another detective named Gill Hooley. (R C604) The detectives showed Zinda a photo lineup. (R C604) Zinda told the detectives that she thought one of the offenders that went through the window looked like Tony's friend that moved the couch. (R C604) Zinda told Goss that after she went to the ground upon the offender's instructions, she was too scared to look up. (R C605)

Defense counsel showed Zinda the six photographs that were in the photo line-up. (R C605) One of the photos was a picture of (Bird) Jimmy Boyd and had an X on it. (R C605) Zinda looked at the photographs and pointed to Mr. Boyd. (R C606) Zinda told the officers that Mr. Boyd was the same person who had helped move the T.V. and the couch. (R C606) Zinda also told the officers she was not positive Mr. Boyd was the offender. (R C606) Zinda did not want to say that she was 100% sure the offender was Bird. (R C606)

On re-cross examination, Zinda claims that she did not know as of January 12, 2003 that Quiles was selling drugs at their apartment. (R C614) Quiles claims that she did not know that there was an electronic scale on the television in her apartment. (R C614) Zinda claimed that she only found out about Quiles selling drugs recently. (R C615)

Elzbieta Chmiel was called as the State's next witness. (R C617) Chmiel was born in Poland and came to the United States in August 1999. (R C618) On January 12, 2003 Chmiel was living with her husband at 25 Maple Court in Addison Illinois in apartment #9, an upstairs apartment. (R C618) At 7:00 A.M. both Chmiel and her husband were asleep when she heard a strange noise. (R C679) Chmiel looked out of two windows in her apartment and at first saw nothing. (R C620) Then Chmiel looked out the first window and saw someone walking very fast or running. (R C620) The person

17

was wearing a sports jacket with a hood and was wearing yellow boots. (R C621) Chmiel was not able to see the person's face. (R C621)

Tom Chmiel, Elzbieta Chmiel's husband, was called as the State's next witness. (R C622) Mr. Chmiel was sleeping at 7:00 A.M. on January 12, 2003 when he heard a big crash causing him to wake up. (R C622A) Mr. Chmiel thought someone broke in but he did not know where upstairs or downstairs. (R C622A) Mr. Chmiel heard screaming and yelling and by sticking his ear to the floor concluded that the noise was coming from downstairs. (R C623) Mr. Chmiel called the police. (R C623) Mr. Chmiel saw a car drive out of the parking lot but did not see any person get in the car. (R C624)

Roger Saran, an officer with the Addison police department testified next. (R C626) Saran was a patrolman and an evidence technician who identifies, collects and preserves evidence. (R C627) Saran received a call to go to apartment #1 at 25 Maple in Addison at 7:00 A.M. (R C628) On cross-examination Saran stated that he inventoried a safe found on the closet floor in the east bedroom. (R C639) The safe was eventually opened and over $10,000.00 was found. (R C640) Saran found a loaded .380 semi-automatic gun not loaded in the safe but there was a magazine that had bullets that was in the gun. (R C640) Saran also recovered $2, 500.00 out of a shoe and $700.00 in a kitchen drawer. (R C641) Saran also found drug paraphernalia such as smoking pipes and rolling papers, which he did not test for drugs and does not know if such testing was done later. (R C641) Evidence Technician Sinkule recovered an electronic scale in the living room on top of a bookcase. (R C643)

On direct examination by defense counsel, Saran stated that he went into the ambulance and spoke to Quiles. (R C645) At no time did Quiles tell Saran he could identify the offender. (R C646) Saran asked Quiles if the offenders wore gloves and he said they did but with no fingers on the gloves. (R C646) Saran did some fingerprinting on a different day at the laboratory of some broken glass. (R C648) However, Saran

18

claimed that no fingerprints of any comparable value were found. (R C649) Saran kept an evidence log of evidence found at the scene, including, the contents of the safe and the brick found lying next to the table. (R C650)

Detective Brian Goss of the Addison Police Department, the lead detective on the case, testified that on January 15, 2003 at 7:30 P.M., Mr. Boyd came to the police station to speak with him. (R C666) Mr. Boyd was not charged with anything at this point and was not in custody. (R C666) Goss and Mr. Boyd talked in an interview room. (R C666)

Goss testified that Mr. Boyd told him that he came to see Goss because Tony Ogle told him that Quiles had been shot and that Goss wanted to talk to him. (R C667) Mr. Boyd told Goss that he knew Quiles through Tony because they had partied together. (R C668) Mr. Boyd said that Quiles had bragged about how much money he had and all the cool items he bought with the money he had. (R C668) Mr. Boyd volunteered this information on his own. (R C668) It seemed to Goss that Mr. Boyd was jealous about the cool items Quiles bragged about. (R C670) Mr. Boyd also told Goss that he and Tony went to Quiles' house to move a large screen T.V. and several couches that Quiles had purchased. (R C669) Mr. Boyd also stated that he met Zinda once when he helped move the T.V. and the couch. (R C669) One time when Quiles was out of the room, Zinda told Mr. Boyd in Tony's presence that there were many people day and night who came up to the window and knock to speak to Quiles. (R C670)

On cross-examination, Goss acknowledged that his conversation with Mr. Boyd occurred on January 15, 2003 and that he had been investigating the case since January 12, 2003. (R C671) The day before, Mr. Boyd came to see Goss, on January 14, 2003 Quiles and Zinda had told Goss that they were 100% sure he was the person who hat moved the T.V. and the couch but they were not 100% sure he was the offender. (R C672) Mr. Boyd came in to the police station within 24 hours of Goss having interviewed

Zinda at her apartment. (R C672) Goss asked Mr. Boyd about having moved the couches and the T.V. and he admitted helping to move them. (R C673) Mr. Boyd told Goss about Quiles' high lifestyle and his bragging about the money he was making. (R C674)

The parties proceeded by way of stipulation. (R C675) Dr. Marcelo Virgili would testify that he is an experienced medical doctor and that he was employed as an emergency room surgeon on January 12, 2003. (R C676) At approximately 8:00 A.M. Dr. Virgili treated Quiles. (R C676) Dr. Virgili observed Quiles having had numerous head injuries and two gunshot entrance wounds on the left and right buttocks. (R C676) Among the tests conducted on January 12, 2003 was a toxicology urine test that detected benzoylecgonine, a metabolite of cocaine. (R C677) Quiles was discharged from the hospital on January 17, 2003. (R C677)

Detective Maranowicz would testify that on January 13, 2003, he received the undamaged bullet removed from Quiles' left thigh, People's Exhibit #15, while he was at Elmhurst Memorial Hospital. (R C678) The bullet was received in a sealed condition and transferred to the DuPage County Crime Laboratory. (R C678) Jennifer Engel would testify that she conducted an analysis from both bullets contained in People's Exhibit #15 and determined that they were both fired from a .380 handgun. (R C678) Engel also conducted an analysis on the two spent cartridge casings in People's Exhibit #14 located by Officer Saran and recovered from 25 Maple Apartment 1. Engel found that they were both spent .380 auto cartridge casings. (R C679)

The State rested. (R C693) The defense called John Beeman, a police officer with the Addison Police Department, as his first witness. (R C694). Beeman testified that on January 12, 2003 at 7:00 A.M., he was one of the first police officers at the crime scene. (R 696) Beeman talked to Zinda but Zinda gave only a very vague description of the offenders. (R C698) Zinda described the offenders only as two male white or

Hispanic individuals. (R C699) In response to Beeman's question whether she knew the offenders or had ever seen them before, Zinda told Beeman she did not know the identity of the offenders and that she had never seen them before. (R C699)

The defense next called John Sinkule, another Addison police officer who was called to the scene on January 12, 2003 at 7:00 A.M. (R C700) Sinkule spoke to Zinda in the emergency room at Elmhurst Hospital to get a description of the offenders. (R C702) Sinkule asked questions as to the offenders' facial characteristics, their age, height, weight, color of their hair, their nationality. (R C704) Zinda told Sinkule that the offenders were male white or male Hispanic, in their 20's and possible gang bangers, one wearing a blue coat. (R C704) Zinda was not able to give a height and weight description and she did not say that she saw the offender on a prior occasion. (R C704) Zinda explained she could not give a better description because she was facing down looking at the floor the entire time. (R C705) Sinkule asked Zinda if she could identify the offenders and she responded that she did not believe she could. (R C705)

The defense recalled Brian Goss to the witness stand. (R C706 ) Goss spoke with Quiles at the hospital on the day of the shooting, January 12, 2003, at 2:30 P.M. (R C707) Quiles appeared lucid and gave Goss a lot of information. (R C708) Quiles gave Goss a detailed explanation that he came home that night at 5:15 A.M., the names of the people he was out with before he came home, the places where he went, and the specific times as to where he was at different places. (R C709) Quiles told Goss about the incident insofar as when he got home, what he was doing and what Zinda was doing when the incident occurred. (R C709)

On January 17, 2003 at 4:00 P.M., Goss spoke with Quiles after Quiles had left the hospital. (R C712) Goss asked Quiles why things had changed regarding his memory. (R C713) Quiles told Goss that since he was out of the hospital and was living at his mother's house, he felt safe. (R C713) Quiles stated he was off the medication

21

meaning the morphine and that he felt as if he was previously suppressing his memory. (R C713) Quiles stated that he did not want to feel as if somebody he knew as a friend, Jimmy Boyd, could have done something like that to him. (R C713) Goss said that when he asked Quiles the litany of questions on January 12, 2003 he had a good memory of events although he was in pain. (R C714)

In the evening of January 14, 2003 Goss interviewed Zinda. (R C714) Zinda stated that when she saw the offender come in it looked like Tony's friend, Mr. Boyd. (R C715) Goss asked Zinda why she changed her story from what she previously told police. (R C715) Zinda explained that that evening was the first time since the incident she got a good night's rest because she was visibly scared and shaken due to the incident. (R C715) Zinda related to Goss that she felt like she had forgotten who had come through her window. (R C716) Zinda did not give any explanations other than she forgot who it was. (R C716)

The last time Goss spoke to Quiles and Zinda was March 29, 2003. (R C716) Goss took written statements at that time. (R C716) After taking those written statements, Goss proceeded to have charges filed against Mr. Boyd. (R C716) Goss put into his police report that the written statements Quiles and Zinda gave on March 29, 2003 were consistent with what they said throughout the investigation. (R C717) Goss stated in his testimony, however, that their written statements were consistent with what they previously said except as to the identity of the offender. (R C717) Goss claimed that the only thing Quiles and Zinda left out of their previous statements was the identity of the offenders who came into their apartment. (R C717) Goss blamed this on fear or suppression of their memory. (R C717)

The defense rested. (R C719) The parties had an instruction conference after which the judge read the instructions to the jury. After deliberations, the jury reached a

guilty verdict on the home invasion, aggravated battery with a firearm and battery charges but reached a not guilty verdict on the armed robbery charges. (R C720)

Defense counsel filed a motion for new trial, which the trial court denied after hearing argument. (R C.L.R. 122) (R C851) A sentencing hearing followed. (R C859) The State called several witnesses in aggravation. (R C 860-941) Mr. Boyd testified in his own defense at the sentencing hearing, claiming his innocence. (R C946, 952) Mr. Boyd noted that Quiles and Zinda knew that Mr. Boyd was innocent but that they got themselves into trouble with the authorities as well as other people. (R C952) Mr. Boyd concluded that it was wrongful to put an innocent person in jail. (R C953)

The parties made argument in aggravation and mitigation. (R C982) The State asked the trial judge not to enter sentence on the aggravated battery with a firearm charge because the conduct underlying that offense is contained within the home invasion count. (R C983) The State acknowledged that the home invasion counts 5 and 7 as to Martha Zinda should merge. (R C985) The State also acknowledged that there should be only one conviction for home invasion as to Martha Zinda and one home invasion conviction as to Ernesto Quiles. (R C985)

The trial judge merged counts 5 and 7 pertaining to home invasion as to Martha Zinda and ordered counts 6 and 8 pertaining to home invasion as to Ernesto Qioles merged. (R C1009,1010) The trial judge entered conviction on count 5, the home invasion count under 720 ILCS 5/12-11(a)(3) as to Martha Zinda. (R C130) (R C34) Mr. Boyd was sentenced to 25 years plus the 15 year add-on enhancement for a total of 40 years. (R C130) Pursuant to 730 ILCS 5/3-6-3(a)(2)(iii), Mr. Boyd was ordered to receive no more than 4.5 days good conduct credit for each month of his sentence. (R C130) The trial court also entered conviction on count 6, the home invasion count as to Ernesto Quiles under 720 ILCS 5/12-11(a)(5). (R C131) (R C35) The trial court sentenced Mr. Boyd to 55 years in prison, 30 years plus a 25 years enhancement under the add-on

provision. (R C131) Pursuant to 730 ILCS 5/3-6-3(a)(2)(iii), Mr. Boyd was ordered to receive no more than 4.5 days good conduct credit for each month of his sentence. (R C131) The sentence on count 6 was to be served concurrently to the sentence on count 5. (R C131) The trial court admonished Mr. Boyd that he had a right to appeal and that he had 30 days from December 5, 2003 to file the notice of appeal. (R C1010) Mr. Boyd filed a notice of appeal on December 9, 2003. (RC137) No motion to reconsider sentence was filed. This appeal follows:

2. With respect to this conviction or sentence, have you filed a petition in a **state court** using any other form of post-conviction procedure, such as *coram nobis* or habeas corpus?   YES ( )        NO (x)

   A. If yes, give the following information with respect to each proceeding (use separate sheets if necessary):

      1. Nature of proceeding _____

      2. Date petition filed _____

      3. Ruling on the petition _____

      3. Date of ruling _____

      4. If you appealed, what was
         the ruling on appeal? _____

      5. Date of ruling on appeal _____

      6. If there was a further appeal,
         what was the ruling ? _____

      7. Date of ruling on appeal _____

3. With respect to this conviction or sentence, have you filed a previous petition for habeas corpus in **federal court**?
           YES ( )   NO (x)

   A. If yes, give name of court, case title and case number: _____

_____

   B. Did the court rule on your petition? If so, state

      (1) Ruling: _____

      (2) Date: _____

## 4. WITH RESPECT TO THIS CONVICTION OR SENTENCE, ARE THERE LEGAL PROCEEDINGS PENDING IN ANY COURT, OTHER THAN THIS PETITION?

YES ( )   NO (x)

If yes, explain: _____

_____

## PART III — PETITIONER'S CLAIMS

1. State briefly every ground on which you claim that you are being held unlawfully. Summarize briefly the facts supporting each ground. You may attach additional pages stating additional grounds and supporting facts. If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds later.

**BEFORE PROCEEDING IN THE FEDERAL COURT, YOU MUST ORDINARILY FIRST EXHAUST YOUR STATE COURT REMEDIES WITH RESPECT TO EACH GROUND FOR RELIEF ASSERTED.**

(A) Ground one The State Failed to Establish Guilt By Proof Beyond A Reasonable Doubt:
Supporting facts (tell your story briefly without citing cases or law):

The Evidence Against Petitioner Was So Weak Or Improbable So As To Raise A Reasonable Doubt As To His Guilt, Thereby Requiring Reversal Of His Conviction. The The State Court's Determination Is Contrary To, and or An Unreasonable Application Of Clearly Established United States Supreme Court Precedent in Jackson v. Virginia, 443 U.S. 307 (1979). Petitioner challenges the presumption of correctness of the State courts' factual finding, he has rebutted this presumption with clear and convincing evidence. An evidentiary hearing will enable Petitioner to prove the petitions allegations, which if true, would entitle the applicant to federal relief.

(B) Ground two The Trial Court Submitted An Erroneous Instruction To The Jury:
Supporting facts:

The Trial Court Submitted An Erroneous Instruction To The Jury That Misinformed Them As To The Elements They Where Required To Evaluate In Determining The Reliability Of Eyewitness Identification Testimony. The State Court's Determination Is Contrary To, and or An Unreasonable An Unreasonable Application of Clearly Established United States Supreme Court Precedent in Manson v Brathwaite, 432 U.S. 98 (1977), and Neil v. Bigger, 409 U.S. 188 (1972). Thus, Petitioner challenges the presumption of correctness of the State courts factual finding because he has rebutted this presumption with clear and convincing evidence. An evidentiary hearing could enable Petitioner to prove the petition's factual allegations, which if true, would entitle the applicant to federal relief.

(C) Ground three   Ineffective Assistance of Trial And Appellate Counsel:
Supporting facts:

Trial Counsel Failed to File An Answer To Discovery; Failed To Present Certain Evidence of Defendant's Innocence; Failed to Object To The State's Delayed Disclosure That Quiles Had Admitted To Selling Drugs And Serving As A Police Informant; Allow The Jury To Hear Prejudicial Evidence Of Defendant's Gang Membership; and Failing To Object To An Incomplete Jury Instruction Regarding Eyewitness Identification Testimony. Furthermore, Appellate Counsel Failed to Raise The Issue Regarding The Jury Instruction, Tardy Disclosure Of Quiles' drug dealing and evidence of gang membership  Thus, Petitioner challenges the presumption of correctness of the State courts factual finding because he has rebutted this presumption with clear and convincing evidence. An evidentiary hearing could enable Petitioner to prove the petition's factual allegations, which if true, would entitle the applicant to federal relief.

2   Have all grounds raised in this petition been presented to the highest court having jurisdiction?
YES (x)   NO ( )

3.  If you answered "NO" to question (16), state briefly what grounds were not so presented and why not:

27

## PART IV -- REPRESENTATION

Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(A) At preliminary hearing __Daniel Francis Murray__

(B) At arraignment and plea __Daniel Francis Murray__

(C) At trial __Daniel Francis Murray__

(D) At sentencing __Daniel Francis Murray__

(E) On appeal __James K. Leven__

(F) In any post-conviction proceeding __David C. Thomas__

(G) Other (state): __Assistant Appellate Defender Kathleen J. Hamill__

## PART V -- FUTURE SENTENCE

Do you have any future sentence to serve following the sentence imposed by this conviction?

YES ( )   NO ( x)

Name and location of the court which imposed the sentence: _____

Date and length of sentence to be served in the future _____

WHEREFORE, petitioner prays that the court grant petitioner all relief to which he may be entitled in this proceeding.

Signed on: __February 23, 2012__
      (Date)

Signature of attorney (if any)

**I declare under penalty of perjury that the foregoing is true and correct.**

(Signature of petitioner)
K-68647
(I.D. Number)
Stateville Corr. Center
(Address)
P.O. Box 112
Joliet, IL 60434

REVISED 01/01/2001

28